# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS
## No. 19-1650V

| | |
|---|---|
| LAURA C. SALZER,<br><br>                    Petitioner,<br><br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>                    Respondent. | Chief Special Master Corcoran<br><br><br>Filed: November 7, 2025 |

*Milton Clay Ragsdale, IV, Ragsdale, LLC, Birmingham, AL,* for Petitioner.

*Austin Joel Egan, U.S. Department of Justice, Washington, DC,* for Respondent.

### DECISION DENYING ENTITLEMENT[1]

On October 24, 2019, Laura C. Salzer filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleged that as a result of an influenza ("flu") vaccine she received on October 26, 2016, she suffered a shoulder injury related to vaccine administration ("SIRVA") as defined by the Vaccine Injury Table (the "Table"). Petition (ECF No. 1) at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters.

---

[1]Because this decision contains a reasoned explanation for the action in this case, I am required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means this Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

For the reasons discussed below, I find that Petitioner is not entitled to compensation, and therefore, the Petition is dismissed.

## I.    Relevant Procedural History

The claim was initiated in the fall of 2019, and the relevant medical records were filed thereafter. ECF Nos. 1-26. On May 24, 2021, after reviewing all the relevant records filed in the case, Respondent filed his report pursuant to Vaccine Rule 4(c) contesting entitlement. ECF No. 28.

On April 20, 2023, I issued an Order to Show Cause stating that the current evidence in the record did not show that Petitioner could establish a Table SIRVA claim, or any causation-in-fact claim. ECF No. 30. Before dismissing the claim, however, I afforded Petitioner one final opportunity to show cause why dismissal of her claim was not appropriate. Since that time, Petitioner has filed a letter from her orthopedic surgeon, Dr. Amanda Jo Robertson-Shepherd, that Petitioner purports supports her claim for entitlement. Ex. 20.

However, after reviewing this additional evidence, I still find that Petitioner has not met her burden of providing that she suffered a Table SIRVA injury or that she has preponderantly proved that the flu vaccination caused her alleged SIRVA injury or any other injury. Thus, for the reasons set forth below, her claim must fail, and the petition is dismissed.

## II.    Relevant Medical History

### 1.  Medical Records

Ms. Salzer received a flu vaccine on October 26, 2016, at the Veterans Health Administration offices. Petitioner's Exhibit ("Ex.") 1 at 1. The vaccination record states that Petitioner received this vaccine in her left deltoid. *Id*. On November 29, 2017, more than one year after vaccination, an addendum was added to the vaccination record stating "[i]njection site for flu vaccine 10/26/2016 is *right* deltoid per employee." *Id*. at 2 (emphasis added).

In her declaration, Ms. Salzer states that she began to feel throbbing pain in her right shoulder and arm on the same day of vaccination, and that her range of motion became limited. Ex. 2; Ex. 17. She further states that her pain became dull and achy with sharp shooting pains from her shoulder to her chest and down her arm. Ex. 2 at 1.

The first documented complaint Ms. Salzer made of right shoulder pain, however, occurred on February 23, 2017, nearly four months after vaccination, when she saw Dr. Kim Foust, an internal medicine specialist at Carolinas Healthcare. Ex. 3 at 409-12. Dr. Foust noted that Ms. Salzer had "an extensive list of concerns," of which most concerned complaints of chest pain and shortness of breath, with pain radiating to the right arm. *Id*. at 409. Petitioner also reported having "right shoulder pain, right foot pain, and left-hand pain since falling." *Id*. On exam, Ms. Salzer had tenderness over the AC joint in her right shoulder, and subjective weakness with internal/external rotation, abduction and past 90 degrees. *Id*. at 412. There is no mention of any pain *related to a flu vaccine* mentioned in these records.

Approximately one week later, on March 4, 2017, Ms. Salzer was evaluated by Dr. Marc Ward, an orthopedist, with a complaint of: "Fell - Pain afterwards." Ex. 3 at 540-44. Dr. Ward's history noted that Petitioner complained of "right shoulder pain, right foot pain, and left hand pain after a fall 8 months ago. She continues to have pain most commonly in her right shoulder." *Id*. at 542. On examination, Dr. Ward documented decreased range of motion on external rotation, forward elevation, and positive impingement signs. *Id*. at 543. An x-ray of Petitioner's right shoulder showed a Type II acromion with some degenerative changes. Ms. Salzer also reported mild foot pain and pain in her left ring finger but indicated that the right shoulder pain was the most severe. *Id*. Dr. Ward recommended an MRI. *Id.* There is no mention of shoulder pain related to flu vaccine in these records.

Ms. Salzer returned to Dr. Foust a few weeks later, on March 6, 2017, to address a variety of issues, none of which included her right shoulder. Ex. 3 at 486-87.

Ms. Salzer underwent an MRI of her right shoulder on March 25, 2017, which was notable for subacromial spurring with findings supporting impingement, but no evidence of a partial or full thickness tear. Ex. 3 at 570. She also displayed a markedly diminished joint recess with thickening of the anterior capsule, raising a question of adhesive capsulitis. *Id.* Ms. Salzer reported that she was still having a dull aching pain in her right arm and felt like it was coming from her neck and then radiated down to her hand if she held it in a certain position. *Id.* Dr. Ward's diagnoses were right shoulder pain, impingement, and rotator cuff tendinitis. *Id.* at 591. He prescribed a Medrol Dosepak and gave her an exercise program to help with rotator cuff strengthening. *Id*.

On June 20, 2017, Ms. Salzer returned to Dr. Ward and reported that she had no improvement with the steroids. Ex. 3 at 623. She continued to exhibit a decreased range of motion of her right shoulder. *Id.* Dr. Ward administered a steroid injection into Petitioner's right shoulder and referred her to physical therapy. *Id*.

Ms. Salzer had her initial evaluation at Kernsville Rehabilitation Specialists on July 10, 2017, to address her right shoulder pain. Ex. 6 at 3. She completed an intake questionnaire concerning the duration of her pain and indicated the date of onset or injury as "last summer July 1, 2016." *Id*. However, when Ms. Salzer discussed her symptoms with a therapist, she stated that she originally injured her right shoulder in September 2016 and "has had pain off and on since that time." *Id*. at 8. Ms. Salzer stated that she became "symptomatic again in April 2017" and received a cortisone injection, but her symptoms had "slowly increased" since that time. *Id*. Ms. Salzer reported "injury to right shoulder, injury to both shoulders, [and] injury to both wrists." *Id*. She described her shoulder issue as a "relapse of a prior episode in 2016." She continued to exhibit a decreased range of motion of her right shoulder and hypersensitivity to palpation. *Id*. at 9. A treatment plan was devised, and Ms. Salzer was instructed to return in two weeks. *Id*.

On August 1, 2017, Ms. Salzer returned to Dr. Ward reporting that the steroid injection "helped tremendously." Ex. 3 at 679. Petitioner also reported that she was continuing with physical therapy and had minimal pain and full range of motion at that time. *Id*. Ms. Salzer was instructed to return on an as-needed basis, and she was "happy with this plan." *Id*.

On October 4, 2017, Ms. Salzer was discharged from physical therapy with improved range of motion. Ex. 6 at 37. The discharge notes stated that Petitioner had partially met her goals but had a recent setback after lifting boxes at her home. *Id*. Ms. Salzer was given a home exercise program and instructed to contact her doctor if her pain did not subside. *Id*.

On November 29, 2017, Ms. Salzer requested that her vaccination record be amended to state that the flu vaccine she received on October 26, 2016, was administered to her right shoulder, instead of her left shoulder as the record indicated. Ex. 1 at 3. A staff nurse at the VA Health Administration completed the addendum which stated, "injection site for flu vaccine 10/26/16 is right deltoid per employee." *Id*.

On December 4, 2017, Ms. Salzer underwent a "routine shoulder MRI" of her right shoulder which was significant for rotator cuff insertional tendinosis and mild subacromial bursitis. Ex. 3 at 848.

Nine days later, on December 8, 2017, Ms. Salzer returned for a follow-up with Dr. Ward. Ex. 3 at 861. At this visit, *and for the first time – more than one year post vaccination* - Ms. Salzer reported a history indicating that her pain started after receiving a flu vaccine. *Id*. Dr. Ward observed that Petitioner was "relaying a history now that this pain started

more when she got a flu injection in that arm. Since then, she has had this inflammatory reaction throughout her arm." *Id.* Petitioner further reported numbness and tingling that went down her arm and into her hand. *Id.* In his assessment, Dr. Ward stated that it was possible that Petitioner had a myositis reaction to the injection that may be causing some of her symptoms. *Id*. Dr. Ward stated that he would schedule an EMG to evaluate her from a neurologic standpoint. *Id*. Ms. Salzer also requested another steroid injection as she stated that the previous injection had provided her with some relief. *Id*. Dr. Ward administered this second injection. *Id*. at 862.

At a follow-up visit with Dr. Foust on the same day, Ms. Salzer reported that she had a "bad reaction to the influenza vaccine last year… she will not take another flu shot…experiencing shoulder pain and right sided neck pain." Ex. 3 at 883-84.

On January 10, 2018, Ms. Salzer underwent an EMG which was normal, with no evidence of a cervical radiculopathy or mononeuropathy in the right upper extremity. Ex. 3 at 918. Later that month, she was evaluated by Dr. Francois Picot, a neurologist, for migraines and other symptoms. Ex. 3 at 975-77. She also reported that she "had a flu shot about 2 years ago" and subsequently developed soreness that progressively got worse and radiated to her chest and down her arms to her fingers, with some numbness as well. *Id*. at 975. On examination, she exhibited decreased mobility in the neck because of neck pain. *Id*. at 977. Dr. Picot noted,

> Right shoulder pain with severe neck pain with radicular symptoms, etiology unclear. I am not sure if a flu injection is really truly the cause. She does have a tendonitis noted on MRI of the shoulder in the rotator cuff area. I reviewed the MRI of the cervical spine with and without contrast which was negative. The EMG has already been done and reveals no cervical radiculopathy and no evidence of an ulnar mononeuropathy.

*Id*.

On January 31, 2018, Ms. Salzer was evaluated by a new primary care provider, Lori Seymour, PA-C. Ex. 3 at 1012-13. She had been terminated from care at Carolina Internal Medicine due to a "patient/provider breakdown." *Id.* at 1012. Ms. Salzer provided a history of symptoms that began after her 2016 vaccination, and stated that "since then she has had right shoulder pain, right arm weakness, atypical chest pain, costochondritis," all of which she felt were related to her vaccination. *Id.* In her assessment, Dr. Seymour wrote, "[u]nsure if patient had an allergic reaction to the flu vaccine. Other symptoms mentioned above are not consistent with flu vaccine. I recommend that we refer her to an allergist for testing of the flu vaccine to rule out allergy." *Id.* at 1013.

On February 27, 2018, Ms. Salzer went to the emergency department at Rowan Medical Center with a complaint of chest pain ongoing for six hours. Ex. 5 at 39-46. She reported a history of right shoulder pain and numbness radiating across her chest, blurred vision and numbness to right side of face. *Id*. On examination, she had some tenderness on her right shoulder, but full range of motion and no swelling. *Id*. at 41. Her presentation was not felt to be a cardiac event, so she was discharged and instructed to follow-up with her neurologist. *Id*. at 43.

On March 13, 2018, Ms. Salzer had an appointment with Dr. Richard Herring, an allergist. Ex. 7 at 1-3. Ms. Salzer reported a "vaccine allergy" to her 2016 vaccination. *Id*. She asserted that she had a possible right arm nerve injury and bursitis that she attributed to the flu vaccine, although she was "not specific" about some of the symptoms. *Id*. at 2. She also reported that within three hours of the vaccine she had shortness of breath, heart palpitations, chest pain, lip and eye swelling, and rhinorrhea. *Id.* Dr. Herring scheduled Petitioner for vaccine allergy testing. *Id*.

On March 20, 2018, Ms. Salzer saw a new orthopedist, Dr. Robert Morgan. Ex. 8 at 4-7. She provided a history of shoulder pain from an influenza vaccination in October 2016 and stated that her pain level at the time of the visit was 8/10, with sharp shooting pain throughout entire shoulder, radiating to her head, across the back of her shoulder, to her neck, and across her chest. *Id*. On examination, Ms. Salzer exhibited a limited range of motion of the right shoulder, full strength, negative impingement signs, and no tenderness to palpation at the AC joint. *Id*. at 5. She was diagnosed with right shoulder adhesive capsulitis and discussed various treatment plans. *Id.* Petitioner received a steroid injection at the conclusion of the visit. *Id*.

Later that day, on March 20, 2018, Ms. Salzer went to the emergency room at Rowan Medical Center with a complaint of worsening right shoulder pain after her steroid injection. Ex. 5 at 66-70. She complained of pain starting in her right shoulder that "radiates to her right side of her chest, to her right jaw, and all [the] way down to her fingertips." *Id*. at 67. The ER physician recommended an MRI of the brain to rule out a stroke, but Ms. Salzer declined requesting an MRI of her shoulder. *Id*. at 70. The ER physician explained that such an MRI was not considered an emergency and suggested that Petitioner follow up with her neurologist to get a nerve condition study. *Id*.

Ms. Salzer saw Dr. Morgan for a follow-up examination on the same day, and she reported 12-15 hours of paralysis, swelling, and redness after her steroid injection. Ex. 8 at 1-3. On examination, Petitioner had mild limitations in ROM of her right shoulder, but her examination was otherwise normal. Dr. Morgan's diagnosis was "[v]ague right upper extremity complaints." *Id*. at 2. Dr. Morgan could not explain Petitioner's symptoms or

relate them to the steroid injection, and recommended that she speak with her PCP or Dr. Picot about a possible referral to pain management or a psychiatrist, as "there does not seem to be a structural cause for her symptoms." *Id.* He further stated that her exam was the same as it had been previously, but Petitioner seemed "extremely focused on documentation," and he was unsure if this was "because of her legal claim of vaccine injury." *Id.* Dr. Morgan stated that he agreed with Ms. Salzer's previous orthopedist, Dr. Ward, and that he did not have much to offer her in terms of improvement. *Id.*

Ms. Salzer followed up with Dr. Herring on March 27, 2018, who noted that allergy testing showed a "slight" positive response to the vaccine. Ex. 7 at 4-5. Dr. Herring noted that Petitioner could be at risk for an IgE mediated reaction to the flu vaccination and recommended that she decline further flu vaccinations. *Id.* However, he felt that her current condition was "less likely to have been triggered by an IgE reaction" and questioned whether she had another type of immune response. *Id.*

On April 18, 2018, Ms. Salzer went to the emergency room at Wake Forest Baptist Medical Center with chronic right arm numbness and weakness, and acute onset of a sharp brief headache and ringing in her ears. She attributed her symptoms generally to her vaccination two years earlier. Ex. 9 at 1-4. After an evaluation and consultation with her neurologist, Ms. Salzer was discharged with a diagnosis of tinnitus. *Id.* at 4.

Ms. Salzer saw a third orthopedist, Dr. Zhongyu J. Li, on June 6, 2018. Ex. 9 at 35-38. She provided a history of right shoulder pain and numbness after her flu vaccine in 2016. Dr. Li diagnosed Petitioner with Thoracic Outlet Syndrome and recommended physical therapy. After her visit, Ms. Salzer sent a note to Dr. Li "with concerns" about her diagnosis. *Id.* at 38. Ms. Salzer called Dr. Li and related that she "believes her pain is not thoracic outlet syndrome based on her extensive research online" and asked to have the diagnosis removed from her chart. *Id.* Dr. Li declined and explained why he felt that this was an accurate diagnosis based upon her symptoms and imaging. *Id.* at 38-39.

On June 20, 2018, Ms. Salzer was evaluated by Dr. Vanessa Baunte, a second neurologist. Ex. 9 at 61-64. Petitioner claimed that her 2016 vaccination had been administered too high in her shoulder and elicited a severe allergic reaction, including chest pain and throat swelling. *Id.* On examination, Ms. Salzer was noted to have decreased giveaway strength in the right upper extremity and decreased facial sensation, but her exam was otherwise normal. *Id.* Dr. Baunte did not feel all of Petitioner's symptoms were explained by her vaccination, noting that "we may not find a cause for [Petitioner's] symptoms."

On June 22, 2018, Ms. Salzer went to the emergency room at Wake Forest Baptist Medical Center with complaints of tingling, weakness, and numbness in her right arm and leg. Ex. 9 at 82-85. A brain MRI was normal, and Petitioner was discharged home when her symptoms stabilized. *Id.* at 84.

Ms. Salzer saw a fourth orthopedist, Dr. Amanda Jo Robertson-Shepherd, on July 18, 2018. Ex. 9 at 124-27. She provided a similar history that her symptoms had started after a flu vaccination. *Id.* On examination, Petitioner had tenderness in her right shoulder, positive impingement signs and subjective numbness. *Id.* Dr. Robertson-Shepherd diagnosed Ms. Salzer with right biceps tendinopathy, rotator cuff tendinopathy and plans included a repeat MRI and possible shoulder arthroscopy. *Id.*

Ms. Salzer met with Dr. Robertson-Shepherd on August 6, 2018, to review the MRI report, and Dr. Robertson-Shepherd stated that Petitioner had "some scapular issues which I believe are the sources of her pain and this can result in TOS-LIKE symptoms but have been derived from her shoulder pain and weakness too." Ex. 9 Surgery was recommended due to the chronicity of Petitioner's right shoulder pain and the failure of conservative treatment options. Ex. 9 at 135-36.

Ms. Salzer underwent an arthroscopic subacromial decompression and open subpectoral biceps tendinosis surgery on August 30, 2018. Ex. 9 at 160-62. The post-operative diagnoses included a right biceps tendon insertional tear and tenosynovitis, as well as severe subacromial bursitis. *Id.* The rotator cuff was found to be intact. *Id.*

Ms. Salzer followed up with Dr. Robertson-Shepherd on September 10, 2018, October 1, 2018, October 29, 2018, and November 26, 2018, for post-operative care. Ex. 9 at 171-194. Petitioner reported that she was doing well, please with her outcome thus far, and had minimal pain. *Id.* at 171. Ms. Salzer also reported that she had regained most of her range of motion after surgery. *Id.*

During a post-operative physical therapy evaluation on October 2, 2018, Ms. Salzer indicated that she had recently been let go as a teacher and would soon be losing insurance. Ex. 9 at 196. She requested a program involving more home exercises and indicated that she is generally able to do most tasks, albeit with some pain. *Id.*

Dr. Robertson-Shepherd saw Ms. Salzer again for follow-up on December 31, 2018, where she reported she had regained most of her range of motion except for internal rotation. Ex. 9 at 281-84. Ms. Salzer also reported that she had no tenderness in her right shoulder. *Id.* at 283. She had finished physical therapy (10 sessions) and was doing well. *Id.* at 216. Petitioner was told to follow-up as needed. *Id.*

Ms. Salzer returned to see Dr. Robertson-Shepherd on August 9, 2019. Ex. 11 at 16-19. She had been in a car accident the prior March, and since then had some scapular tightness and occasional popping in her AC joint. *Id.* On examination, she had excellent active range of motion with mild scapular winging which could have worsened a little from the car accident. *Id.* She was instructed to follow-up as needed. *Id.* Petitioner followed up on November 12, 2019, and April 8, 2020, for symptoms unrelated to her shoulder. Ex. 11 at 92-97, 115-120.

### 2. Declaration Evidence

#### a. Ms. Salzer

Ms. Salzer submitted two declarations in support of her claim. Exs. 2, 17. In her first, dated October 22, 2019, Ms. Salzer stated that on the same day that she received the flu vaccine, she began "experiencing throbbing pain in [her] shoulder and arm." Ex. 2 at 1. She further stated that the range of motion in her shoulder and arm became limited, and her arm became "dull and achy with sharp shooting pains from my shoulder to my chest and down my arm." *Id.*

In her second declaration, Ms. Salzer explained that despite the information in her vaccination record, she had received the flu vaccine in her right deltoid. Ex. 17 at 1. She stated that the VA nurse had initially wanted to give the vaccine in her non-dominant left arm, but Ms. Salzer had received the flu vaccine in her left arm the previous year and had wanted to alternate arms. *Id.* Ms. Salzer stated that she contacted the VA and had her vaccine record corrected to document the correct arm of administration. *Id.*

Regarding the delay in seeking treatment for her right shoulder, Ms. Salzer stated that on the day of her vaccination, she was in "excruciating pain in [her] right deltoid, [her] entire right shoulder area, and [her] right arm." Ex. 17 at 1. In addition, she stated that she started to exhibit signs of an allergic reaction. *Id.* at 2. Ms. Salzer stated that she did not seek medical care for her shoulder at first because "I thought the pain would go away on its own. At the time, I could not have imagined that I would have continued to experience pain from the flu shot for months." *Id.* Ms. Salzer further stated that in December 2016, she began to search for a primary care physician to address her shoulder pain, as well as other "medical questions." *Id.* She stated that this process took a few months, and she did not connect her shoulder pain with the vaccination at that time.

Ms. Salzer also explained the circumstances of the "fall" that she experienced in July 2016 that is referenced in the medical records. She stated that in July 2016, she had fallen during a nature walk and fell on her left side, scraping her right knee and foot. Ex. 17 at 3. She stated that she did not fall on her right shoulder at this time. *Id.* Instead, she

stated that when she was seen for her right shoulder by Dr. Ward at Piedmont Orthopedics, she was pressured "by the nurse and staff to provide a reason for my injury so they could send the charges to my health insurance… I did mention that I slipped and fell in July of the previous year." *Id*.

Regarding the alleged association between vaccination and her injury, Ms. Salzer stated that she started to put together a timeline of the events since she had gotten the flu vaccine in 2016, and that it "did not dawn on [her]" that the pain in my shoulder I had been suffering with for over a year had been from the flu shot. It was only because of having to get another one in the fall of 2017 that [I] realized that the flu shot caused the shoulder injury the previous year." Ex. 17 at 6.

### b. Randy Howard

Ms. Salzer submitted a declaration from her husband (and former boyfriend) Randy Howard in support of her claim. Ex. 18. Mr. Howard stated that "[d]uring the first 48 hours following Laura's vaccine, she expressed concern about chest pains, heart palpitations, extreme pain in her right shoulder, tingly feeling in her arm and shoulder, and numbness in her shoulder and arm. *Id*. at 1. He stated that Ms. Salzer complained of severe pain and did not go to work the next day because of the pain. *Id*. In the weeks that followed, Mr. Howard stated that Ms. Salzer stopped her exercise routine because her shoulder was bothering her. *Id*. He stated that she "needed accommodations for nearly every activity," such as dressing, bathing, and driving. *Id*. at 1-2.

Mr. Howard also corroborated Ms. Salzer's recollection of the fall in July 2016 during the nature walk where Petitioner slipped on some wet rocks and fell. Ex. 17 at 3. He stated that Ms. Salzer had fallen on her left side and injured her right foot and knee. *Id*. Mr. Howard stated that her injuries from the fall were minor, and she did not seek any medical treatment. *Id*.

### c. Karen Holbrook

Ms. Salzer filed a declaration from Karen Holbrook, a licensed Practical Nurse at W.G. Hefner Sailsbury VAMC. Ex. 19. Ms. Holbrook stated that she saw and spoke to Ms. Salzer "almost every day both before and after her vaccination." *Id*. Ms. Holbrook stated that following her flu vaccination, Ms. Salzer complained of right shoulder pain when trying to eat with her right hand. *Id*. Ms. Holbrook also stated that Petitioner had difficulty working on her computer with her right hand and was not able to lift or carry her bags or purse on her right shoulder. *Id*. She stated that Ms. Salzer's shoulder pain

"persisted for a long time thereafter until she had shoulder surgery, which helped relieve most of her symptoms." *Id*.

### d.  Amanda Jo Robertson-Shepherd, MD

Ms. Salzer submitted a letter from Dr. Robertson-Shepherd (the physician that performed Petitioner's shoulder surgery in August 2018), dated June 8, 2023. Ex. 20 at 3-5. Dr. Roberston-Shepherd stated that she first met Ms. Salzer on July 18, 2018, to evaluate Petitioner's right shoulder. *Id*. Ms. Salzer reported to Dr. Robertson-Shepherd that she had seen her PCP "for right shoulder pain after getting a flu shot and then waited for a referral where she was sent to an orthopedic surgeon closer to her living area." *Id*. Ms. Salzer reported that she was discharged from these physicians "as being too needy," and she reported that the physicians and nurses "forced her to put inaccurate information down to put within her chart…" as well as noting other inaccurate information in her medical records. *Id*. Dr. Robertson-Shepherd also noted that "[t]he people who administered her flu vaccine in her right arm refused to fix their notes as well." *Id*.

Dr. Robertson-Shepherd next stated in her letter that after she heard that Ms. Salzer had an injury due to a vaccine in her right arm, that she "knew exactly what I had to do and how to fix it," and that she "had seen this type of injury twice before, but never knew the name of it." Ex. 20 at 4. Apparently, Ms. Salzer explained to Dr. Robertson-Shepherd that her injury was called a "'SIRVA' injury which stood for 'shoulder injury related to vaccine administration.'" *Id*. Dr. Robertson-Shepherd stated that she assured Ms. Salzer that she knew how to "fix" her shoulder and scheduled another MRI. *Id*. Dr. Robertson-Shepherd noted in her letter that she told both Ms. Salzer and her husband that she "love[d her] job, and I'm damn good at what I do." *Id*.  She then booked Ms. Salzer for surgery.

Dr. Robertson-Shepherd noted that Ms. Salzer attended all her pre-operative appointments and was nervous about the surgery, but was reassured that she would no longer have pain in her right shoulder once the surgery was completed. Ex. 20 at 5. Dr. Roberston-Shepherd stated that she performed a subacromial decompression and a biceps tendinosis on Ms. Salzer and that Ms. Salzer "came through surgery beautifully." *Id*. Dr. Robertson-Shepherd noted that she did not have to repair the right shoulder rotator cuff, but did have to clean out scar tissue and that she had never "seen a bursa sac so damaged or 'angry' as I told them both…" *Id*. Ms. Salzer was noted to have attended all her post operative appointments and physical therapy visits. *Id*. She was noted to have minimal pain and Dr. Robertson-Shepherd stated that after Petitioner healed, "she has not had any further pain or need for anything else regarding her right shoulder to this day. I believe I fixed her SIRVA injury." *Id*.

### III.  **Petitioner's Response to Show Cause Order**

Petitioner argues that the medical records, declarations, and Dr. Robertson-Shepherd's letter all clearly demonstrate that she suffered a SIRVA injury following receipt of the flu vaccine on October 26, 2016. Response to Show Cause ("Response") at 4-5. Petitioner argues that resolution of these fact issues must take into consideration the declarations of her husband, coworker and other witnesses, including her own correspondence with and from her treating physician. Response at 5. Ms. Salzer explains that her vaccination record incorrectly noted the arm of administration as her left arm, and she contacted the vaccine administrator to have it corrected. *Id*. She further argues that the declarations of her witnesses establish that her shoulder pain began within 48 hours of her October 26, 2016 flu vaccination. *Id*. at 6. Petitioner contends that her medical records establish that she had reduced range of motion in her right shoulder and that the findings from her surgery are related to a SIRVA injury by Dr. Robertson-Shepherd. *Id*. Petitioner also argues that there are no other conditions or abnormalities that could have caused her condition. *Id*. at 7. She stated that the fall that she experienced around July 2016 did not cause any injury to her right shoulder. *Id*. Finally, Petitioner argues that her treating physicians attributed her right shoulder symptoms to vaccination "and not some other condition or abnormality." *Id*.

### IV.  **Applicable Law**

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove, by a preponderance of the evidence, the matters required in the petition by Vaccine Act Section 11(c)(1). A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. Section 13(b)(1). "Medical records, in general, warrant consideration as trustworthy evidence.  The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Hum. Servs*., 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Hum. Servs*., No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, this rule does not always apply. "Written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." *Murphy v. Sec'y of Health & Hum. Servs.*, No. 90-882V, 1991 WL 74931, *4 (Fed. Cl. Spec. Mstr. April 25, 1991), quoted with approval in decision denying review, 23 Cl. Ct. 726, 733 (1991), *aff'd*

*per curiam*, 968 F.2d 1226 (Fed.Cir.1992)). And the Federal Circuit recently "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Hum. Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021).

The Court has also said that medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery v. Sec'y of Health & Hum. Servs.*, 42 Fed. Cl. 381, 391 (1998) (citing *Blutstein v. Sec'y of Health & Hum. Servs.*, No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998). The credibility of the individual offering such testimony must also be determined. *Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Hum. Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id*.

In attempting to establish entitlement to a Vaccine Program award of compensation for a non-Table claim, a petitioner must satisfy all three of the elements established by the Federal Circuit in *Althen v. Sec'y of Health and Hum. Servs.,* 418 F.3d 1274, 1278 (Fed. Cir. 2005): "(1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of proximate temporal relationship between vaccination and injury."

## ANALYSIS

## I.    SIRVA Table Elements

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove, by a preponderance of the evidence, the matters required in the petition by Vaccine Act Section 11(c)(1). In addition to requirements concerning the vaccination received, the

duration and severity of petitioner's injury, and the lack of other award or settlement,[3] a petitioner must establish that he suffered an injury meeting the Table criteria, in which case causation is presumed, or an injury shown to be caused-in-fact by the vaccination she received. Section 11(c)(1)(C).

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48 hours of the administration of an influenza vaccine. 42 C.F.R. § 100.3(a)(XIV)(B). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following (set forth in the Table's Qualifications and Aids to Interpretation ("QAI")):

> (i) No history of pain, inflammation, or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;

> (ii) Pain occurs within the specified time frame;

> (iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and

> (iv) No other condition or abnormality is present that would explain the patient's symptoms (*e.g.*, NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. Section 13(b)(1). "Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the

---

[3] In summary, a petitioner must establish that he received a vaccine covered by the Program, administered either in the United States and its territories or in another geographical area but qualifying for a limited exception; suffered the residual effects of her injury for more than six months, died from his injury, or underwent a surgical intervention during an inpatient hospitalization; and has not filed a civil suit or collected an award or settlement for her injury. *See* § 11(c)(1)(A)(B)(D)(E).

balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Hum. Servs.*, No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, the Federal Circuit has recently "reject[ed] as incorrect the presumption that medical records are always accurate and complete as to all of the patient's physical conditions." *Kirby v. Sec'y of Health & Hum. Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021). Medical professionals may not "accurately record everything" that they observe or may "record only a fraction of all that occurs." *Id.*

Medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery v. Sec'y of Health & Hum. Servs.*, 42 Fed. Cl. 381 at 391 (1998) (citing *Blutstein v. Sec'y of Health & Hum. Servs.*, No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998). The credibility of the individual offering such testimony must also be determined. *Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Hum. Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id*.

The special master is obligated to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe Sec'y of Health & Hum. Servs.*, 110 Fed. Cl. 184 at 204 (2013) (citing § 12(d)(3); Vaccine Rule 8); *see also Burns v. Sec'y of Health & Hum. Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational).

## II.    Factual Findings Regarding a Table SIRVA

After a review of the entire record, I find that a preponderance of the evidence demonstrates that Petitioner cannot satisfy all of the QAI requirements for a Table SIRVA. I will address only those QAIs I deem not to have been met.

### A.    Prior Right Shoulder Condition or Injury

The first requirement for a Table SIRVA is a lack of problems associated with the affected shoulder prior to vaccination that would explain the symptoms experienced after vaccination. 42 C.F.R. § 100.3(c)(10)(i). The specific language of the relevant QAI portion states that there must be "[n]o history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection." 42 C.F.R. § 100.3(c)(10)(i).

There are at least two references in the medical records that indicate that Petitioner may have experienced a prior right shoulder injury. When Ms. Salzer had her initial evaluation at Kerns Rehabilitation Specialists on July 10, 2017, to address her shoulder pain, she completed an intake questionnaire concerning the duration of her right shoulder pain and indicate the date of onset or injury as "last summer July 1, 2016." Ex. 6 at 3. However, when Ms. Salzer discussed her symptoms with a therapist, she stated that she originally injured her right shoulder in *September 2016* (the month before vaccination), and "has had pain off and on since that time." *Id*. at 8. She also characterized her shoulder issue as a "relapse of a prior episode in 2016." *Id*.

Ms. Salzer provided a similar history to Dr. Ward, her first orthopedist, at a visit on March 4, 2017, asserting more specifically that her symptoms had started eight months earlier (meaning the summer of 2016). Ex. 6 at 542. She also completed an intake questionnaire at the same visit, indicating the reason for her visit as "Fell- pain afterwards."[4] *Id*. at 540. Dr. Ward's history noted that Petitioner complained of "right shoulder pain, right foot pain, and left hand pain after a fall 8 months ago. She continues to have pain most commonly in her right shoulder." *Id*. at 542. Ms. Salzer has also associated her right shoulder pain with a "relapse of a prior episode in 2016." Ex. 6 at 3. It was only when Ms. Salzer herself began to associate her right shoulder pain with vaccination, that notes from her doctor appear in the record noting her association.

Although Petitioner attempts to explain her references to the prior fall explaining that her right shoulder was not injured and that her medical records contain inaccurate

---

[4] Petitioner wrote letters to several of her treating physicians to have her medical records changed. *See* Ex. 13. These requests appear to all have been declined.

information, I cannot simply ignore the multiple references in the record to a prior shoulder injury. Thus, I find that Petitioner cannot satisfy this QAI criterion.

### B.    Pain Occurring Within the Specified Timeframe (Onset)

Much more problematic is the second SIRVA criterion, which requires that a petitioner alleging a SIRVA must show that her pain occurred within two days, or 48 hours, of vaccination. (42 C.F.R. § 100.3(c)(10)(ii) (QAI criteria)).

While Ms. Salzer states in her unsworn declaration that she felt pain on the same day as her vaccination, she did not seek medical treatment for her right shoulder until February 2017, almost four months after vaccination. Importantly, at that PCP visit, Ms. Salzer did not attribute her right shoulder pain to her vaccination. Instead, Petitioner attributed her right shoulder symptoms (and other symptoms including right foot pain and left-hand pain) to a fall. Ex. 3 at 410. For over a year, Ms. Salzer consistently attributed her various symptoms to a fall that occurred sometime in the summer of 2016. It was not until she saw Dr. Ward on December 8, 2017, more than one year after vaccination, that Ms. Salzer attributed her symptoms to her flu vaccination in October 2016, Ex. 3 at 861.

Petitioner claims to have experienced "excruciating pain" the day of vaccination and had assumed that the pain "would go away on its own." Ex. 17 at 2-3. "I still could not fathom that I was injured from the flu vaccine that happened a couple of months prior." *Id*. at 4. Ms. Salzer also has stated that she and her husband only figured out the timeline for her injury after the fact, based in part on their lack of awareness that a vaccine could cause such an injury. But the totality of the evidence preponderantly supports the conclusion that Ms. Salzer's shoulder pain did *not* occur within 48 hours of her vaccination.

In her first visit with her PCP after vaccination, on February 23, 2017, for example, Dr. Foust noted that Ms. Salzer had "an extensive list of concerns." Ex. 3 at 410. Her main concern was "episodes of chest pain and shortness of breath. On February 11 …she was folding laundry and she had episodes of severe chest pain and shortness of breath with pain radiating to her right arm." *Id*. The notes also state that Ms. Salzer experienced blurry vision, numbness, tingling, and difficulty with speech. *Id*. Petitioner did report that "her right arm did feel heavy the other day when she had the chest pain or shortness of breath at home." *Id*. Here, the record indicates that Ms. Salzer's initial complaint of right shoulder pain began on February 11, 2017, while folding laundry and which Ms. Salzer associated with her chest pain. The second reference to right shoulder symptoms was a feeling of heaviness which Ms. Salzer reported began "the other day." This appointment occurred in February 2017, thus, the reference to "the other day" most likely occurred sometime in

2017 and not within 48 hours of her October 26, 2016 vaccination. This record is the most contemporaneous medical record in relation to Ms. Salzer's October 26, 2016 vaccination, and is clear, consistent, and complete. Thus, it will be afforded substantial weight. *Lowrie,* 2005 WL 6117475, at *20.

This evidence preponderantly demonstrates that Petitioner has failed to meet this criterion. However, I will also note that Ms. Salzer was evaluated by Dr. Ward on March 4, 2017, where she indicated that her right shoulder pain may have been due to a fall as indicated in her intake questionnaire. Ex. 3 at 540. She also had an initial evaluation at Kernsville Rehabilitation Specialists on July 10, 2017, to address her right shoulder pain. Ex. 6 at 3. There, she indicated that the onset of her injury as "last summer July 1, 2016." *Id*. However, when Ms. Salzer discussed her symptoms with a therapist, she stated that she originally injured her right shoulder in September 2016 and "has had pain off and on since that time." *Id*. at 8. She also characterized her shoulder issue as a "relapse of a prior episode in 2016." *Id*. All of this evidence preponderates in a finding that Petitioner did not experience the onset of the right shoulder pain within 48 hours of her October 26, 2016 vaccination. Thus, Petitioner has failed to fulfill the second criterion.

### C.    Petitioner's Pain and Limited Range of Motion was not Limited to her Right Shoulder

The specific language of a SIRVA injury contained in the QAI of the Vaccine Injury Table is that "pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered." 42 C.F.R. § 100.3(c)(10)(iii) (QAI criteria)). The first issue that must be resolved is whether Petitioner received the October 26, 2016 flu vaccination in her right (injured) shoulder.

The vaccination record reflects that Petitioner received a vaccine in her left arm, not her right arm. Ex. 1 at 1. More than one year later, the nurse who administered the vaccine added an addendum to the record stating that that Petitioner asserts the injection site was on the right side. *Id*. at 2. Nonetheless, I note that all of the medical records, besides the vaccination record, note that Ms. Salzer received the vaccination in her right shoulder and received all of her treatment in her right shoulder. All of Petitioner's medical providers evaluated and diagnosed right shoulder symptoms. There is no other record to the contrary. But even though Petitioner likely received the vaccine in her right shoulder, the record does not also suggest her symptoms were limited to that shoulder.

Thus, when Ms. Salzer complained of right shoulder pain, she also consistently reported a myriad of symptoms to her providers of pain outside her right arm. Indeed, the very first time she reported right shoulder pain on February 23, 2017, she reported an "extensive list of concerns", including an episode that same month where she had severe

chest pain and shortness of breath, with pain radiating to her right arm and numbness and tingling in her upper and lower extremities. *Id*. at 410. Petitioner also reported "right shoulder pain, right foot pain, and left hand pain since falling." Id. at 410.

Throughout her medical records, Petitioner consistently reports symptoms outside of her shoulder during appointments where she is either seen or treated for her right shoulder pain. *See, e.g.* Ex. 3 at 591 (reporting pain coming from her neck and radiating down the right arm); Ex. 6 at 3 (reporting an injury to both shoulders and wrists, characterizing shoulder pain as a relapse of a prior issue in 2016); Ex. 3 at 861 (reporting numbness and tingling going down her arm into her hand); *Id*. 975 (reporting numbness and pain in her right arm that seemed to occur more frequently when Petitioner had migraines); *Id*. at 1013 (reporting shoulder pain, weakness, atypical chest pain, and costochondritis after her flu vaccine). I thus find that Petitioner, more likely than not, has *not* fulfilled this criterion.

### D.    There is Evidence of Another Condition or Abnormality

The last criterion for a Table SIRVA states that there must be no other condition or abnormality which would explain Petitioner's current symptoms. 42 C.F.R. § 100.3(c)(10)(iv). Respondent has argued that Ms. Salzer's right shoulder symptoms pre-dated her vaccination, and it was not until more than a year after the vaccine that petitioner began to attribute the symptoms to her vaccination. Respondent's Report at 15. Thus, Respondent claims that Petitioner has failed to establish a Table claim.

Respondent's objection has merit. For there *is* ample evidence of another "condition or abnormality" that would explain Petitioner's symptoms: an accidental fall. Ex. 3 at 410 (Petitioner "reported "right shoulder pain, right foot pain, and left hand pain since falling."); *see also* Ex. 3 at 540 (Petitioner completed an intake questionnaire, indicating the reason for her visit being that she "Fell- Pain afterwards. Dr. Ward's history noted that Petitioner had complained of "right shoulder pain, right foot pain, and let hand pain after a fall 8 months ago. She continues to have pain most commonly in her right shoulder." *Id*. at 542.") Ms. Salzer has also associated her right shoulder pain with a "relapse of a prior episode in 2016." Ex. 6 at 3. It was only when Ms. Salzer herself began to associate her right shoulder pain with vaccination, that notes from her doctor appear in the record noting her association. Here, to obtain the causality presumption, Petitioner (not Respondent) must *affirmatively* satisfy each Table element—and this one clearly requires her to *rule out* other explanations for her pain and related deficiencies. *See* 42 C.F.R. § 100.3(c)(10)(iv) ("[n]o other condition or abnormality is present that *would explain* the patient's symptoms (e.g., NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy)" (emphasis added). But as

discussed above, and as not persuasively undermined by Petitioner's treaters or experts, ample record evidence exists – as reflected in *Petitioner's own statements*—that other things could explain (specifically Petitioner's fall) the shoulder pain Petitioner clearly experienced. There are simply too many references in the record to this fall, *that Petitioner reported*, to ignore. This is enough to defeat her Table showing.

## II.    Petitioner Has Not Shown Entitlement to Damages Under a Causation-in-Fact Claim

The record also establishes that Petitioner would not likely succeed in establishing the elements of a causation-in-fact claim arising out of the same evidence.

To be awarded compensation, a petitioner "must show that the vaccine was 'not only a but-for cause of the injury but also a substantial factor in bringing about the injury." *Moberly v. Sec'y of Health & Human Servs.*, 592 F.3d 1315, 1321-22 (Fed. Cir. 2010) (citing *Shyface v. Sec'y of Health & Human Servs.*, 165 F.3d 1344, 1352-53 (Fed. Cir. 1999)). To establish a prima facie case for actual causation, petitioner must show by preponderant evidence that the vaccinations brought about her injury by providing: (1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination were the reason for the injury; and (3) a showing of a proximate temporal relationship between the vaccination and onset of the injury. *Althen v. Sec'y of Health & Human Servs.*, 418 F.3d 1274, 1278 (Fed. Cir. 2005).

As discussed above, it appears that Ms. Salzer's right shoulder symptoms pre-dated her vaccination, and it was not until more than a year after vaccination that Petitioner began to attribute her symptoms to her vaccination. Thus, the flu vaccine could not have caused her injury. Although Ms. Salzer submitted a letter from one of her treating physicians to support her claim, this letter does not contain any medical theory casually connecting Petitioner's October 26, 2016 flu vaccination to her right shoulder injury. Dr. Roberson-Shepherd's letter merely outlines Petitioner's treatment and symptoms without articulating any type of medical theory. Thus, *Althen* prong one is not met.

Overall, the mix of evidence presented by this case (no preponderant showing of a Table SIRVA injury, and evidence of confounding factors that prevent the satisfaction of the "did cause" *Althen* prong) do not support the claim. This does not mean that *all* non-Table SIRVAs will fail, or should. But a more robust showing must be made than was offered in this case if they are going to succeed. *Compare L.J. v. Sec'y of Health & Hum.*

*Servs.*, No. 17-0059V, 2021 WL 6845593, at *15–17 (Fed. Cl. Spec. Mstr. Dec. 2, 2021) (noting that petitioner provided preponderant evidence to prevail under the *Althen* test).[5]

## Conclusion

Based on the entire record in this case, I find that Petitioner has not carried her burden of proof, whether the claim sounds as a Table or causation-in-fact claim. In the absence of a motion for review filed pursuant to RCFC Appendix B, the Clerk of the Court **SHALL ENTER JUDGMENT** in accordance with the terms of this Decision.[6]

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master

---

[5] Although *L.J.* stands as an example of a successful non-Table SIRVA claim, the facts and circumstances posed therein are distinguishable (and highlight why the present case could not similarly succeed). For starters, the *L.J.* Petition was filed *prior* to the time when SIRVA was added to the Vaccine Table (although I looked to the Table elements for guidance). *L.J.*, 2021 WL 6845593, at *8. Otherwise, *L.J.* turned on different fact questions involving pain experienced elsewhere in the body.

[6] Pursuant to Vaccine Rule 11(a), the parties may expedite entry of judgment by each filing (either jointly or separately) a notice renouncing their right to seek review.